The TEXAS FRUIT PALACE, INC., Appellant,

v.

The CITY OF PALESTINE, Appellee.

No. 12–90–00248–CV.

Court of Appeals of Texas, Tyler.

Aug. 31, 1992.

Rehearing Denied Jan. 6, 1993.

---

Billy H. Gragg, Palestine, Brooks Hardee, Tyler, for appellant.

George Staples, Jr., Hurst, Charles W. Nichols, Palestine, for appellee.

BILL BASS, Justice.

This is a case involving a city's condemnation of property for the use of the federal government. The Texas Fruit Palace was awarded $160,000 for its property interest after the City of Palestine (hereinafter "the City") initiated condemnation proceedings in order to transfer the property to the United States Postal Service. The Texas Fruit Palace challenges the constitutionality of the condemnation on grounds that the property was not applied to "public" use. We will affirm the trial court's judgment.

The Texas Fruit Palace is a non-profit corporation that operates the Anderson County Fair (hereinafter Texas Fruit Palace will be referred to as "the Fair"). In 1947, the Fair leased 13.034 acres from the City for the purpose of holding fairs, circuses, or other performances. The lease agreement provided that the Fair, for a term of fifty (50) years, pay rent of one dollar per year, plus divide with the City any rents and revenues from circuses or

other performances. Later, the lease period was extended ten years so that the lease would end in the year 2007.

In 1987, the City adopted a resolution authorizing the City Attorney to initiate condemnation proceedings to condemn the Fair's leasehold interest in the 13.034 acres. The purpose of the condemnation, according to the resolution, was "for the use of the United States Government, to-wit: a post office." Three months later, the City adopted another resolution, declaring that the condemned property was also to be used for city offices, other city buildings, parking facilities, and streets and alleys. The City thereafter commenced condemnation proceedings in the District Court of Anderson County, where the court entered judgment based on a court-appointed commissioner's determination that the value of the leasehold estate was $160,000. Subsequently, the City executed a deed, conveying 7.0353 acres out of the 13.034 acres to the United States Postal Service.

The Fair brings four points of error on appeal. In its first point of error, the Fair challenges the validity of the condemnation. In points of error two, three, and four, the Fair argues that, in the event we hold the condemnation valid, the trial court committed reversible error in the admission and exclusion of certain evidence.

In its first point of error, the Fair argues that the condemnation of its leasehold interest for use by the United States Postal Services was void because the City's power of eminent domain was not exercised for "public purposes." The Fair insists that the State of Texas and its subdivisions, as a sovereign in our federal system, may exercise only its power of eminent domain to condemn property for a legitimate public purpose of the state. The postal service being an exclusively federal function, the Fair argues, a condemnation by a state for a post office would be an invalid exercise of that power. The Fair cites the United States Supreme Court case of *Kohl v. United States*, 91 U.S. 367, 23 L.Ed. 449 (1876), in support of its position.

In *Kohl*, the Court announced that the right of eminent domain was a "right be-longing to a sovereign created to take property for its own public use, not for those of another." *Kohl*, 91 U.S. at 373, 23 L.Ed. 449 (adopting the Michigan Supreme Court's view in *Trombley v. Humphrey*, 23 Mich. 471 (1871)). The issue confronting the Court in *Kohl* was not a state's right to condemn land for federal purposes, but the federal government's right of eminent domain for its own use without the consent of the state. Though the language in *Kohl* was dicta, the principle has nevertheless been applied to limit a state's power to condemn property for use of the federal government. *See Darlington v. United States*, 82 Pa. 382 (1877) (condemnation by state for U.S. government buildings held unconstitutional). However, the authorities cited by the Fair are not conclusive in supporting an absolute restriction on states' power to condemn land for an exclusively federal use by the U.S. government. States have been permitted to condemn property for some federal purposes, even when the purpose is a traditionally exclusive federal function. *See Rockaway Pacific Corp. v. Stotesbury*, 255 F. 345 (2d Cir.1917) (state allowed to condemn for defense purposes); *Fishel v. Denver*, 106 Colo. 576, 108 P.2d 236 (1940) (condemnation by city for U.S. air corps technical school upheld); *Branch v. Lewerenz*, 75 Conn. 319, 53 A. 658 (1902) (state's right to condemn for the benefit of the U.S. Navy); *Burt v. Merchants' Ins. Co.* 106 Mass. 356 (1871) (state allowed to condemn for a post office and treasury building).

The Fair insists that the law with regard to the power of a state to condemn land for use of the federal government is fully developed and unambiguous. It argues that a state's right of eminent domain does not extend to condemnation for an exclusively federal purpose, but a state may condemn land for the federal government when the use is common to both governments or authorized by congressional enactment. There is no shortage of decisions which turn upon the question of what federal purposes are exclusive. However, we do not agree that the United States or Texas Constitutions can be interpreted to

limit the state's power to condemn property for federal purposes to only those purposes deemed by the courts to be "non-exclusive." In fact, the majority rule appears to be that the exercise of the power of eminent domain by a state or under the authority of a state, if otherwise valid, is not invalidated by the fact that the power is exercised for the benefit or use of the United States. 143 A.L.R. 1040, 1042. In light of more recent opinions articulating the role of legislatures and the judiciary in determining whether the power of eminent domain is being exercised for public purposes, we believe the proper view is to defer to the legislature's declaration of a public purpose, unless the purpose is clearly private in nature. *Housing Authority v. Higginbotham*, 135 Tex. 158, 143 S.W.2d 79, 83 (1940); *West v. Whitehead*, 238 S.W. 976, 978 (Tex.Civ.App.—San Antonio 1922, writ ref'd); *see Berman v. Parker*, 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954).

■ The Texas Constitution states that "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person...." TEX. CONST. art. 1, § 17. The validity of the City's exercise of its condemnation power turns on what is considered a public use by the legislature. The presumption is that a use is public when the legislature declares that a particular use is public. *West v. Whitehead*, 238 S.W. 976, 978 (Tex.Civ.App.—San Antonio 1922, writ ref'd). In *Imperial Irrigation Co. v. Jayne*, the Texas Supreme Court stated:

> The power of eminent domain has been delegated by the people to the legislative department of the government in the general grant of legislative power. Whether the power of eminent domain shall be put in motion for any particular purpose, and whether the exigencies of the occasion and the public welfare require or justify its exercise, are questions which rest entirely with the Legislature.

*Imperial Irrigation Co. v. Jayne*, 104 Tex. 395, 138 S.W. 575, 587 (1911). Similarly,

the United States Supreme Court in *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), explained that "[t]he role of the judiciary in determining whether that power [of eminent domain] is being exercised for a public purpose is an extremely narrow one." *Id.* at 32, 75 S.Ct. at 102.

■ Section 280.001 of the TEXAS LOCAL GOVERNMENT CODE provides, in part, that "[a] municipality or county, separately or jointly, may acquire land for the use of the United States government, either by a lease for a term of years or in fee simple title." By enacting this provision, we believe the Texas Legislature has declared that land used by the United States government is a "public use" under its right to eminent domain. The legislature's enactment of Section 280.001 was not violative of any state or federal constitutional limitations on the power of eminent domain. Consequently, we conclude that the condemnation of the Fair's leasehold interest was a valid exercise of the City of Palestine's power of eminent domain under the Texas Constitution and Section 280.001 of the Texas Local Government Code. Point of error one is overruled.

■ In its second point of error, the Fair argues that the trial court erred when it excluded evidence supporting its allegations that the City acted in bad faith when it condemned the Fair's leasehold interest. In its brief, the Fair cites three instances where the court excluded evidence supporting the allegations of bad faith on the part of the City. The first is testimony of the Fair's valuation expert, Raymond Woodard. The Fair does not explain what evidence adduced from the valuation witness could support its allegations of bad faith, and neither is it clear from the record. Furthermore, the court excluded Mr. Woodard's testimony because of the inappropriate valuation method employed. The trial court did not err in excluding Mr. Woodard's testimony.

■ The second instance of evidence that the Fair contends was erroneously excluded was the deposition testimony of Jack Shelden. The court sustained the

City's relevancy objection, excluding Mr. Shelden's testimony concerning an indemnity agreement that the City entered into with a title company. The Fair argues that this fact was relevant to its allegation of bad faith because the City improperly assumed liability in the event that the ongoing litigation between the City and the Fair rendered the title to the property unmarketable. The Fair fails to explain how this would constitute a bad faith condemnation of the its property, especially since the Fair was not adversely affected by the indemnity agreement.

█ The Fair cites a third instance of excluded evidence in support of its bad faith allegation. The court excluded the testimony of Jesse George, Jr., a certified public account, who was to testify regarding the financial condition of the City at the time of the condemnation. The court excluded the evidence on relevancy grounds. The Fair's argument is that the funds used by the City for condemnation of the property must be available at the time of the condemnation; failure to do so constitutes bad faith. The City insists that this requirement was met since it deposited $160,-000 in the registry of the district court long before the case was tried. The court took judicial notice of this fact and sustained the City's objection. We believe the court properly excluded Mr. George's testimony. The Fair fails to cite applicable authority that the City's conduct constitutes bad faith. Point of error two is overruled.

█ In its third point of error, the Fair argues that the trial court erred in excluding certain testimony of the Fair's real estate appraiser, Raymond Woodard. The court made its ruling after hearing the live testimony of Mr. Woodard, Mr. Woodard's previous deposition testimony, and arguments of both parties. The court concluded, based upon the appraiser's own testimony, that the valuation method used was improper and was not one used by other appraisers, or one that Mr. Woodard had ever used before. Mr. Woodard was asked, "Do you have anything anywhere in any of your appraisal manuals that suggests that that's an appropriate way to arrive at val-

ue?" Mr. Woodard answered, "Not that I know of. I don't know that it is or is not. To me it's reasonable, because we're bringing the people current, whole."

The Fair's appraiser admitted that when he examined the leased property to determine the highest and best use, he only considered the property's use as a fairground, and not for either residential or commercial use. He also testified that the value of the Fair's leasehold interest was greater than the value of the land and improvements. Furthermore, he valued the property interest as it related to what it would cost the Fair to purchase substitute land and buildings.

█ The court concluded that since the appraiser himself admitted that this theory of appraisal was unique and not standard practice, any testimony of value calculated by this method should be excluded. The measure of value of a leasehold estate is the value of the use and occupancy of the leasehold for the remainder of the tenant's term, less the agreed rent; the values are determined by the usual willing buyer, willing seller rule. *Luby v. City of Dallas*, 396 S.W.2d 192, 198 (Tex.Civ. App.—Dallas 1965, writ ref'd n.r.e.). The testimony of a witness who uses an unauthorized and improper valuation method should be excluded. *City of Corsicana v. Herod*, 768 S.W.2d 805, 813 (Tex.App.—Waco 1989, no writ). Since the trial court has substantial discretion in determining the admissibility of evidence of market value in a condemnation case, we conclude that the trial court did not err in excluding the evidence. *State v. Angerman*, 664 S.W.2d 794, 796 (Tex.App.—Waco 1984, writ ref'd n.r.e.). Point of error three is overruled.

█ In its fourth and final point of error, the Fair insists that the court erred in overruling its motion to strike the testimony of the City's valuation expert witness, James Norwood. The Fair failed to object to any of Mr. Norwood's testimony, and only moved to strike the testimony after the Fair had re-called Mr. Norwood during its own case-in-chief. The City had already rested its case, the Fair had put on

its evidence, and the court had excluded the Fair's expert when the motion to strike was made. A motion to strike must ordinarily be made at the time the testimony is given, if the fact that it is objectionable is then apparent. *Collins v. Smith*, 142 Tex. 36, 175 S.W.2d 407, 408-09 (1943). The Fair gives no explanation as to why it failed to object to Mr. Norwood's testimony, or why it failed to move to strike until after the City's case-in-chief. We conclude that the Fair's failure to object and timely move to strike Mr. Norwood's testimony waived any error on appeal. The Fair's fourth point of error is overruled.

The trial court's judgment is affirmed.